OPINION *Page 2 
{¶ 1} Defendant-appellant Shae Jorgensen appeals his adjudication and commitment by the Licking County Court of Common Pleas, Juvenile Division for rape. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On November 11, 2006, Appellant, a seventeen year-old, high school student, attended a party at the residence of Alisha Abel. Alisha's mother was away for the evening visiting her boyfriend, but consented to a small gathering in her absence. Alisha invited a group of friends, including Justine Rathburn, who she invited to spend the night.
 {¶ 3} At the party, Justine was upset due to a fight with her boyfriend, Todd Foraker. She had an argument with Foraker on the phone, and told him she was "going to go have fun." Chris Avery, a friend, overheard Justine say she was going to go "fuck" Appellant that night. Avery informed Appellant of Justine's comments. Justine told Alisha Abel she wanted to "hook up" with Appellant, and Alisha told Appellant. Justine denied the statements.
 {¶ 4} Alcohol was served at the party, and both Appellant and Justine Rathburn admitted to consuming alcohol. Justine testified she consumed one, four-ounce drink of orange juice and vodka, two shots of vodka, some beer, and another orange juice and vodka, about an inch high.
 {¶ 5} At the party, Justine was seen kissing Appellant. At some point during the evening, witnesses saw Justine and Appellant in a bedroom where they were kissing, groping, "grinding" and "petting" each other. *Page 3 
 {¶ 6} Later, Deirdre Chasteen, Alisha Abel's mother, came home after receiving a phone call from her landlord about the party. She was upset to learn alcohol was being consumed, and told those in attendance to leave or she would call the police. Chasteen asked Justine whether she wanted to stay with Alisha or go back to her parent's house. Justine told Chasteen she wanted Appellant to come pick her up. Chasteen, a bartender by trade, did not observe signs of Justine being intoxicated, and allowed her to be picked up by Chase Meldau, Appellant and Nick Roelle. Appellant and Justine then proceeded to Chris Avery's apartment. Alcohol was not consumed at Avery's apartment.
 {¶ 7} Shortly after arriving at Avery's apartment, Appellant, Justine, and Chris Haggerty were in the bathroom together. Justine alleges Appellant and Haggerty engaged in sexual activity with her without her consent. As a result, Appellant was charged with rape, in violation of R.C. 2907.02(A)(1)(c), as applied to adults in violation of R.C. 2152.02(F).
 {¶ 8} The trial court adjudicated Appellant delinquent of the charge of rape on May 18, 2007. A dispositional hearing was held on July 6, 2007, and the trial court committed Appellant to the Ohio Department of Youth Services for a minimum of one year and a maximum period not to exceed the age of twenty-one. The trial court classified Appellant a sexually oriented offender.
 {¶ 9} Appellant now appeals, assigning as error:
 {¶ 10} "I. APPELLANT'S ADJUDICATION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE IN VIOLATION OF HIS RIGHTS UNDER THE DUE PROCESS CLAUSES OF THEFIFTH AND FOURTEENTH AMENDMENTS TO THE *Page 4 
UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 16 OF THE OHIO CONSTITUTION; OR ALTERNATIVELY, WAS AGAINST THE MANIFEST OF THE EVIDENCE.
 {¶ 11} "II. APPELLANTS RIGHT TO A FUNDAMENTALLY FAIR TRIAL, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION WAS VIOLATED BY DISPLAYS OF INTEMPERATE JUDICIAL BEHAVIOR AND EXPRESSIONS OF BIAS BY THE COURT AGAINST APPELLANT.
 {¶ 12} "III. APPELLANTS RIGHT TO A FUNDAMENTALLY FAIR TRIAL, AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION WAS VIOLATED WHEN THE TRIAL COURT PREVENTED APPELLANT FROM PRESENTING A DEFENSE ON THE ISSUES OF IMPAIRMENT, THE ALLEGED VICTIMS VERACITY AND WAS PREJUDICED BY THE TRIAL COURT'S SPECULATION AND ERRONEOUS EVIDENTIARY CONCLUSIONS.
 {¶ 13} "IV. THE SENTENCE OF A MINIMUM OF ONE YEAR INCARCERATION FOR THE SINGLE COUNT OF RAPE IS UNSUPPORTED BY THE RECORD AND IS CONTRARY TO LAW."
 I. {¶ 14} In the first assignment of error, Appellant argues his conviction for rape is against the sufficiency and the manifest weight of the evidence.
 {¶ 15} A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. State v. *Page 5 Thompkins, 78 Ohio St .3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, superseded by constitutional amendment on other grounds as stated byState v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N.E.2d 668. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion." State v.Thompkins, supra at 78 Ohio St.3d 390.
 {¶ 16} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. State v.Jenks (1991), 61 Ohio St.3d 259, superseded by the State constitutional amendment on other grounds as stated in State v. Smith (1997),80 Ohio St.3d 89.
 {¶ 17} Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. State v. Jenks, supra. This test raises a question of law and does not allow the court to weigh the evidence. State v. Martin (1983), 20 Ohio App.3d 172, 175. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."State v. Thompkins, 78 Ohio St.3d at 386.
 {¶ 18} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact *Page 6 
clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N .E.2d 541 super ceded by constitutional amendment on other grounds as stated byState v. Smith, 80 Ohio St.3d 89, 1997-Ohio-355, 684 N .E.2d 668, citingState v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, syllabus 1.
 {¶ 19} Appellant was charged with violating R.C. 2907.02(A)(1)(c), as applied to adults and in violation of R.C. 2152.02(F) as made applicable to juveniles.
 {¶ 20} R.C. 2907.02(A)(1)(c) reads:
 {¶ 21} "(A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 {¶ 22} * * *
 {¶ 23} "(c) The other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age." *Page 7 
 {¶ 24} The Ohio Supreme Court has held "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct." State v. Zeh (1987), 31 Ohio St.3d 99. "Substantial impairment" need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." State v. Brady, Cuyahoga App. No. 87854,2007-Ohio-3333.
 {¶ 25} R.C. 2907.02 makes the activity unlawful if the victim's ability to resist or consent is substantially impaired. A finding Appellant did not use force does not equate with a finding that the victim had the ability to consent or to resist. Accordingly, the issue in the case at bar is whether the victim's ability to resist or give consent to the sexual conduct and sexual contact she had with Appellant was substantially impaired. See, also, State v. Brady, supra.
 {¶ 26} Appellant maintains there was ample evidence demonstrating Justine Rathburn was not substantially impaired from alcohol at the time she and Appellant engaged in sexual activity. Appellant further argues the inconsistencies in the testimony should be weighed in his favor.
 {¶ 27} At trial, Justine Rathburn testified:
 {¶ 28} "Q. Okay. Now, about how much alcohol do you think you drank that night? *Page 8 
 {¶ 29} "A. I had one screwdriver, which was, I don't know, probably four ounces maybe. And then I had a couple shots of vodka. And I had not very much beer, but like a little —
 {¶ 30} "Q. Okay. And how long were you there while you were drinking?
 {¶ 31} "A. I believe we were there probably til almost 11 maybe.
 {¶ 32} "Q. So, what time did you get there about —
 {¶ 33} "A. Probably about ten.
 {¶ 34} "Q. And you were there til about 11?
 {¶ 35} "A. Yeah, I'd say.
 {¶ 36} "Q. Okay.
 {¶ 37} "A. We probably left around 10:45.
 {¶ 38} "Q. Had you eaten before you went over there?
 {¶ 39} "A. I ate early — earlier on in the day, but I hadn't had anything else.
 {¶ 40} "Q. Okay. How much do you weigh, Justine?
 {¶ 41} "A. I weigh 106.
 {¶ 42} "Q. Okay. And did you weigh that much in November?
 {¶ 43} "A. Yes. I think I weighed, like, 105, 106, around that area.
 {¶ 44} "Q. Now, have you seen people drink before —
 {¶ 45} "A. Yes.
 {¶ 46} "Q. — that night?
 {¶ 47} "Okay. Had — had you drank before that night?
 {¶ 48} "A. Yes, I have.
 {¶ 49} "Q. Okay. Do you know what people look like when they're drunk? *Page 9 
 {¶ 50} "A. Yes, they're very obnoxious. They laugh a lot. They're kind of stumbling. They slur their words. They're kind of messy.
 {¶ 51} "Q. Okay. And do you know how it feels to be drunk?
 {¶ 52} "A. Yes.
 {¶ 53} "Q. Okay. How did you feel that night?
 {¶ 54} "A. I felt drunk. I mean, I even said that I was drunk, because I felt really dizzy and I was really woozy and just, like, sloppy. I just didn't feel like I was sober.
 {¶ 55} "Q. Were you able to physically walk?
 {¶ 56} "A. I could walk but I would stumble when I — I kinda like lean back and forth.
 {¶ 57} "Q. Were you able to talk clearly?
 {¶ 58} "A. I don't think I was talking right then. I was k [sic] of real loud because I thought that I was talking really quiet."
 {¶ 59} Tr. at 52-54.
 {¶ 60} Later during trial, Rathburn testified:
 {¶ 61} "Q. Okay. Go ahead and tell me what happened.
 {¶ 62} "A. I had gone to the bathroom so I could, you know, do what I needed to do. And I didn't know if the door locked or anything. So, I just shut it and I didn't figure anybody would come in.
 {¶ 63} "Well, Shae came in and he said, I have to use the bathroom. And I was finished, so, I pulled up my pants and then I went — I was getting ready to leave. And I had leaned up against the wall because I felt really light headed at that time. And I was just sitting there and I was just, like, I'm so gone right now. And (inaudible), oh, come *Page 10 
on, will you give me head? I said, no. I said, I'm not going to do that. (Inaudible) please get off there. And he's like, oh, come on, please, please. I really want to. I know you want to, too (inaudible). And I said, no, I don't want to do anything. I said, I'm not going to do anything with you. And he said, oh, please, please (inaudible). And he pulled down his pants and took my head and — and I said, I'm not going to do this because — I stopped because I didn't want to. He said, I wasn't going to because I told him that.
 {¶ 64} "And, so, I went to get up and he got up at the same time and he was forceful and he proceeded to start to unbutton my pants for him to finger me. He was like, oh, can I please finger you? Come on, I need something. I said, no, I just don't — want to get out of here.
 {¶ 65} "At that time Chris Haggerty had walked in and I asked what's he doing in here? You know, because I didn't understand why he was in the bathroom at that time. And he was like, oh, he — he's just in there. He needs to go to the bathroom. And I could just tell that he was just standing there. He was just standing by the door. I didn't understand why he was standing by the door. I said, you know, why are you and he (inaudible)? And I said — I was so out of it. And I was just like — my mind was in a different place. I was just in and out. I was, you know, I can't explain the in and out. It was — I was there and then I — you know, I can't think of the words. And — I don't' know.
 {¶ 66} "Q. Were you still feeling intoxicated at that point?
 {¶ 67} "A. Yes, I was — I — I even kept saying that, so, I knew that I was drunk because I had felt that way before. And I had — I was on the floor the whole time. I *Page 11 
was up against the bathtub where Shae had gotten on the floor and Chris had gotten on the floor. Chris Haggerty started to take off my shoes. And I said, why are you talking off my shoes? He's like, oh, because it's good for you. And I said, how is that good for me? And I — and I was just like, I don't know what's going on.
 {¶ 68} "And, so, Shae unbuttoned my pants and Chris started to take them off. I said, what are you doing? What are you doing? They're like, oh, nothing, nothing. And I — you know, I didn't know what to say. I — I couldn't — I felt I couldn't do anything. My body was just kind of there.
 {¶ 69} "And, so, Shae and (inaudible). My underwear was still on and everything. He had moved them to the side and he tried having intercourse with me. And I said, no, I can't do this. And then he started to take off my underwear. I just didn't know what to do, because (inaudible) couldn't move at all. And my mind was in a different place. And I was just, like, I was out. I — I couldn't do anything. I couldn't — I tried moving to the side. I tried calling people. I had my cell phone right by my side and I tried calling people because I can just hit a button and it would just call someone. And no one would answer my call at all. I thought if I call someone maybe someone would answer. And no one answered. So, I couldn't do anything.
 {¶ 70} "And then they took my cell phone, stuck it on the toilet. And when they got my underwear off Shae continued to have sex with me. And I didn't know what to do. I told him to stop it. I told him I didn't want it at all. And there's [sic] was nothing I could do. And I tried calling more people and just no one ever answered.
 {¶ 71} "And then they had picked me up. Shae had got off the toilet after I got my cell phone and threw it somewhere. And they sat me on top of him. And then I *Page 12 
could just hear them saying, oh, come on, let's tag team her. Let's tag team her. And then Chris said, I've been trying to do that. I've been trying to do that. And he's like, oh, come on, let's do this. And then I had fallen off of his lap. And he said — you know, I just laid back. And I was just — I couldn't say anything. And then they had turned my body to where my head was (inaudible). And I could hear people chiming in. I could hear people outside the door. I stuck my fingers under the door and tried wiggling them so maybe someone might (inaudible) again. And, you know, I tried pounding on the door a little bit like — just like smacking. And no one could get in. And Shae was on the floor and then Chris decided or whatever he took down my shirt and he started sucking on my chest and he proceeded to finger me.
 {¶ 72} "At that time I had completely — I was — I was gone like. And then I heard the door open and I was sitting up and I was crying and Raquel asked me what was wrong. And I told her that he had — that Shae had raped me. And I couldn't find my underwear. She tried helping me find my underwear because I — I was like, where's my underwear? It was gone. All that was in there was my pants and the clothes that were still on me.
 {¶ 73} "And I didn't know what to do. So, Raquel had took me to a separate room and Ross McConeghy went in there and just kept me calm. And she had found my underwear outside — outside in some mud or something.
 {¶ 74} "So, I was down on the bed and I cried and I tried calling Todd a couple more times and he didn't ever answer. And that was about it."
 {¶ 75} Tr. at 59-64.
 {¶ 76} The trial court then inquired of Rathburn: *Page 13 
 {¶ 77} "The Court: In just a moment, Mr. Dawson, I'll permit you to ask questions, but I do have a question since it's on my mind. And it relates to some questions — a series of questions that were asked of you by Mr. Stansbury, the attorney.
 {¶ 78} "And the question is this: As I understand your testimony, you did not consume or drink any alcoholic beverages at Chris Avery's?
 {¶ 79} "The Witness: Right.
 {¶ 80} "The Court: Is that true?
 {¶ 81} "The Witness: I did not at Chris Avery's.
 {¶ 82} "The Court: The only alcoholic beverages that were consumed by you, to the best of your knowledge, were consumed at Alisha's?
 {¶ 83} "The Witness: Yes.
 {¶ 84} "The Court: And then you've described in some — in some detail the fact that I believe you said you had two shots of vodka?
 {¶ 85} "The Witness: Yes.
 {¶ 86} "The Court: You had a screwdriver and some beer.
 {¶ 87} "The Witness: Yes.
 {¶ 88} "The Court: Now — now we're getting to the point where I'm going to ask you the relevant question.
 {¶ 89} "At Alisha's, who prepared the drinks for you? Did you prepare your own drinks or did someone else prepare or give you any alcoholic beverages to drink?
 {¶ 90} "The Witness: I believe Alisha prepared the drinks.
 {¶ 91} "The Court: At any time did Shae Jorgensen prepare a drink for you?
 {¶ 92} "The Witness: No, he never prepared one. *Page 14 
 {¶ 93} "The Court: At any time did Shae Jorgensen give you a drink?
 {¶ 94} "The Witness: Yes.
 {¶ 95} "The Court: An alcoholic beverage?
 {¶ 96} "Okay. When and where was that?
 {¶ 97} "The Witness: That was at Alisha's house in the kitchen. It was right before her mom came home. He gave me a little bit of a screwdriver.
 {¶ 98} "The Court: And — and did you drink that screwdriver?
 {¶ 99} "The Witness: Yes.
 {¶ 100} "The Court: I want to, again, maybe this sounds redundant, but I want to make certain that I understand the facts. Is that the only screwdriver that you had that night at Alisha's or anywhere else?
 {¶ 101} "The Witness: No. There was two that night. I had the one that Alisha had made and then the one that Shae had handed me.
 {¶ 102} "The Court: Do you remember what your initial testimony was a few moments ago, in terms of what you had to drink?
 {¶ 103} "The Witness: Yes.
 {¶ 104} "The Court: What was your — what was your testimony?
 {¶ 105} "The Witness: I said that I had a screwdriver that was probably about four ounces and two shots of vodka and a little bit of beer.
 {¶ 106} "The Court: Okay. And that's my recollection from my notes, but are you changing your testimony and saying you had two screwdrivers?
 {¶ 107} "What did you just tell me less than a minute ago as to what Shae had given you? *Page 15 
 {¶ 108} "The Witness: He had given me a little bit of a screwdriver.
 {¶ 109} "The Court: And what had Alisha given you?
 {¶ 110} "The Witness: A screwdriver.
 {¶ 111} "The Court: So, how many screwdrivers did you have that night?
 {¶ 112} "The Witness: Two.
 {¶ 113} "The Court: Why did you say earlier you had — you only had one, one twelve-ounce screwdriver?
 {¶ 114} "The Witness: Because that's what I could remember.
 {¶ 115} "The Court: Mr. Dawson?
 {¶ 116} "Mr. Dawson: Thank you, Your Honor."
 {¶ 117} Tr. at 100-103.
 {¶ 118} At trial, Nick Roelle and Ross McConeghy, friends of Appellant and Justine, testified they observed Justine intoxicated, slurring her words and having difficulty walking.
 {¶ 119} Chris Avery, at whose apartment the incident in question took place, testified:
 {¶ 120} "Q. Okay. And did you see her very much there at Alisha's?
 {¶ 121} "A. Yeah, I seen her, you know, chug a few — I mean, you know, chug one of those drinks and — I was mostly in the living room —
 {¶ 122} "Q. Okay.
 {¶ 123} "A. — with Shae.
 {¶ 124} "Q. Now, based on what you just told me, your experience with people who have been drinking, did she look like she had been drinking? *Page 16 
 {¶ 125} "A. Yeah, about 15 minutes later she did.
 {¶ 126} "Q. How did she act?
 {¶ 127} "A. You know, kind of — kind of stumbling, slurring her words a little bit.
 {¶ 128} "* * *
 {¶ 129} "Q. Okay. Now, did you try to get into the bathroom?
 {¶ 130} "A. Yes, Raquel did. She had to pee.
 {¶ 131} "Q. Okay. And what happened?
 {¶ 132} "A. They just kept the door shut. I mean, you know, really wouldn't let her in. They said that they'll let — they'll be out in a few minutes.
 {¶ 133} "Q. Okay. And you heard that?
 {¶ 134} "A. Yes.
 {¶ 135} "Q. Okay. Did you ever go to the bathroom door yourself?
 {¶ 136} "A. Yes.
 {¶ 137} "Q. What happened?
 {¶ 138} "A. When Chris — Chris answered the door and said that Shae and Justine were having sex on the floor.
 {¶ 139} "Q. Okay. Chris Haggerty?
 {¶ 140} "A. Chris Haggerty said that.
 {¶ 141} "Q. Okay. All right. Did you ever go to the door again or ask them to come out again?
 {¶ 142} "A. Yeah, we went there — we went to the door, you know, probably three or four more times.
 {¶ 143} "Q. And? *Page 17 
 {¶ 144} "A. Nothing.
 {¶ 145} "Q. They didn't come out —
 {¶ 146} "A. I mean —
 {¶ 147} "Q. — or they didn't answer you or —
 {¶ 148} "A. Nothing. They didn't come out or nothing.
 {¶ 149} "Q. Okay. What — did you — did you ask them to come out?
 {¶ 150} "A. Yeah, yeah, we — we kept asking them to come out because Raquel said she — you know, she had to use the restroom and she kept banging on the door. And I believe Ross McConeghy kept banging on the door, too.
 {¶ 151} "Q. Okay. But you didn't hear them say anything to you —
 {¶ 152} "A. No.
 {¶ 153} "Q. — after that first time?
 {¶ 154} "Okay. All right. What happened — did they ever come out?
 {¶ 155} "A. Yes, they came out.
 {¶ 156} "Q. Okay. And where did they go? Who came out first of all?
 {¶ 157} "A. Huh?
 {¶ 158} "Q. Let me step back. Who came out first of all?
 {¶ 159} "A. Chris Haggerty, Shae Jorgensen and Justine. I don't know.
 {¶ 160} "Q. Did they come out together?
 {¶ 161} "A. No.
 {¶ 162} "Q. Okay. Who came out first?
 {¶ 163} "A. Chris and Shae come out together.
 {¶ 164} "Q. And where did they go? *Page 18 
 {¶ 165} "A. To my bed.
 {¶ 166} "Q. Okay. Were you in there or —
 {¶ 167} "A. Yes.
 {¶ 168} "Q. — you still making noodles?
 {¶ 169} "A. I was in my bedroom.
 {¶ 170} "Q. Okay. Did they say anything to you?
 {¶ 171} "A. Uh —
 {¶ 172} "Q. Did Chris say anything to you about what happened in the bathroom?
 {¶ 173} "A. Yes.
 {¶ 174} "Q. What did he say to you?
 {¶ 175} "A. Mentioned that Shae and Justine were having sex on the toilet and he said he tried to get behind her or something like that.
 {¶ 176} "Q. What does that mean to you, Chris?
 {¶ 177} "A. He was trying it, too, I guess. I don't know.
 {¶ 178} "Q. Trying to do what? It's okay you can —
 {¶ 179} "A. Have sex with her, too.
 {¶ 180} "Q. Okay. How were — then did Justine come out later?
 {¶ 181} "A. Yes, after Raquel helped her get dressed, Raquel Sorq.
 {¶ 182} "Q. Okay. And did you — were you at the door then or were you in the bedroom? Where were you at that point?
 {¶ 183} "A. When she came out? I was in my bedroom.
 {¶ 184} "Q. Okay.
 {¶ 185} "A. Well, I was kind of walking out. *Page 19 
 {¶ 186} "Q. Okay. And how were Shae and Chris Haggerty acting at that time?
 {¶ 187} "A. Normal.
 {¶ 188} "Q. Okay. How was Justine acting?
 {¶ 189} "A. Belligerently drunk.
 {¶ 190} "Q. Was she happy, sad?
 {¶ 191} "A. No, she was sad.
 {¶ 192} "Q. Laughing, crying?
 {¶ 193} "A. I don't think she was crying. She was just real upset.
 {¶ 194} "Q. Okay. All right.
 {¶ 195} "* * *
 {¶ 196} "The Court: Okay. But you — you said that, in your opinion, Christine was drunk?
 {¶ 197} "The Witness: Justine?
 {¶ 198} "The Court: Or Justine was drunk at Alisha's place.
 {¶ 199} "The Witness: Oh, yeah.
 {¶ 200} "The Court: And you told us why. And, again, why? What — what did you see that caused you to believe that she was drunk?
 {¶ 201} "The Witness: Slurring. I mean, walking crookedly.
 {¶ 202} "The Court: Did you see her at any time fall down?
 {¶ 203} "The Witness: She fell into my bed afterwards. That's all I seen.
 {¶ 204} "* * *
 {¶ 205} "Q. Chris, when you said — when you said that Justine fell on the bed, what did you mean? How did she fall? *Page 20 
 {¶ 206} "A. I believe she was pretty drunk to fall like that. I mean, she came of the my bathroom and fell straight on to my bed. My bed to my — I mean, from my door to my bed is about from me to you and she fell on the bed, I mean, pretty much perfectly.
 {¶ 207} "Q. Okay. Now, and you said she was belligerently drunk. I think that's the term you used.
 {¶ 208} "A. Yeah, she —
 {¶ 209} "Q. What do you mean by that?
 {¶ 210} "A. — was pretty drunk.
 {¶ 211} "Q. What did you mean by `belligerently drunk'?
 {¶ 212} "A. She was drunk enough to not be able to walk to me (sic) bedroom, which is ten feet away from the bathroom.
 {¶ 213} "Q. So, to you being that drunk and belligerent?
 {¶ 214} "A. Yeah.
 {¶ 215} "Q. Okay. Was — was she mad, was she —
 {¶ 216} "A. She was upset."
 {¶ 217} Tr. at 137-139; 141-144; 173-180.
 {¶ 218} Later, Raquel Sorg testified:
 {¶ 219} "A. And when they walked out, that's when I walked into the bathroom and Justine had been on the floor with her pants off.
 {¶ 220} "Q. Okay. Did Shae instruct you to go in and help her?
 {¶ 221} "A. No.
 {¶ 222} "Q. Okay. So what happened when you walked in and saw her on the ground? *Page 21 
 {¶ 223} "* * *
 {¶ 224} "A. She — she was devastated. Like she — she was crying and she — I don't think she realized what just happened.
 {¶ 225} "Q. Why don't you think she realized what just happened?
 {¶ 226} "A. Because she couldn't really put her words altogether. She could just say that she was hurt and that all she just kept saying was that she hated them and she didn't want to talk to him ever again.
 {¶ 227} "Q. Okay. Was she crying?
 {¶ 228} "A. Yes.
 {¶ 229} "Q. Okay. She said she was hurt. Did she say where?
 {¶ 230} "A. She just kind of pointed down towards her lower stomach.
 {¶ 231} "Q. Lower-stomach area?
 {¶ 232} "A. Uh-huh.
 {¶ 233} "Q. And said that's where she was hurt?
 {¶ 234} "A. Yeah."
 {¶ 235} Tr. at 204-205; 208-216.
 {¶ 236} After an extensive review of the record, we find there is ample evidence demonstrating Appellant engaged in sexual conduct with Justine Rathburn. Further, there is competent, credible evidence of Rathburn's substantial impairment from intoxication at the time of the sexual conduct. Accordingly, Appellant's adjudication of delinquent of the crime of rape is against neither the manifest weight nor the sufficiency of the evidence.
 {¶ 237} The first assignment of error is overruled. *Page 22 
 II. {¶ 238} In the second assignment of error, Appellant asserts the intemperate judicial behavior demonstrated by the trial court, and the court's expression of bias violated his right to a fair trial.
 {¶ 239} Specifically, Appellant notes the trial court's continual reference to Justine Rathburn as the victim. Appellant argues the trial court demonstrated a personal opinion in favor of Justine Rathburn, and the trial court attempted to lead Justine Rathburn's testimony to demonstrate she was intoxicated. Finally, Appellant cites the following statements made by the trial court prior to adjudication:
 {¶ 240} "The Court: The Court then will reconvene this case tomorrow at 9:00, at which time both the prosecution and the defense can make a closing argument. The prosecution can also make a rebuttal argument as well. And I — so, I want to make it very clear that the Court has not made any decision. Do both you boys understand that?
 {¶ 241} "Now, having said that — having said that, I can saying (sic) beyond all reasonable doubt that based upon the evidence that's been presented I find both of you disgusting. Absolutely disgusting. I have to wonder to myself what kind of morals each of you boys has, because your behavior disgusts me, absolutely positively. That goes way beyond the issue of guilt or innocence.
 {¶ 242} "I do want to make certain that you understand that tomorrow, if at the close of the arguments that are made by counsel, closing arguments, which is not evidence, if the Court finds that the State has failed to establish by a burden of proof of beyond a reasonable doubt your guilt as alleged in each of the complaints, the *Page 23 
complaints will be dismissed. And they would be, therefore, eligible to have — to have their records sealed or expunged.
 {¶ 243} "If, however, the Court finds, upon listening to closing arguments and after having reviewed the evidence, that the State has met its burden, there is a substantial likelihood that the Court may revoke your house arrest and place each of you in juvenile detention pending the Court conducting a dispositional hearing. So, I just want to make certain that each of you are aware that that can theoretically happen tomorrow. Do you understand what I'm saying?"
 {¶ 244} May 17, 2007 Tr. at 280-281.
 {¶ 245} Judicial bias is defined as "a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts." State v. LaMar,95 Ohio St.3d 181, 767 N.E.2d 166, 2002-Ohio-2128, at ¶ 34.
 {¶ 246} A trial judge is "presumed not to be biased or prejudiced, and the party alleging bias or prejudice must set forth evidence to overcome the presumption of integrity." Weiner v. Kwiat, 2d Dist. No. 19289, 2003-Ohio-3409, at ¶ 90, quoting Eller Wendy's Intl., Inc. (2000),142 Ohio App.3d 321, 340, 755 N.E.2d 906. "The existence of prejudice or bias against a party is a matter that is particularly within the knowledge and reflection of each individual judge and is difficult to question unless the judge specifically verbalizes personal bias or prejudice toward a party." Id.
 {¶ 247} "The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a *Page 24 
thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."In re J.P. Linahan, Inc., 138 F.2d 650, 654 (CA2 1943). Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant.
 {¶ 248} * * *
 {¶ 249} "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. * * * Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration — even a stern *Page 25 
and short-tempered judge's ordinary efforts at courtroom administration — remain immune."
 {¶ 250} Liteky v. U.S. (1994), 510 U.S. 540, 550-551, 114 S.Ct. 1147,1155.
 {¶ 251} A trial judge is presumed to act in a fair and impartial manner. A trial court's questioning of a witness is not deemed partial for purposes of Evid. R. 614(B) merely because the evidence elicited during the interrogation was damaging to one of the parties. In reGray (April 20, 2000), Cuyahoga App. No. 75984.
 {¶ 252} While we acknowledge Appellant's concerns with the judicial remarks exchanged at trial, we find the same do not rise to the level of bias or prejudice as set forth in the case law above.
 {¶ 253} The second assignment of error is overruled.
 III. {¶ 254} In the third assignment of error, Appellant argues the trial court denied him the right to a fair trial by not allowing the defense to present evidence of the alleged victim's veracity and on impairment.
 {¶ 255} Specifically, Appellant cites the following exchange at trial during the testimony of Chris Avery:
 {¶ 256} "Q. Okay. Now, Miss Wells asked you some questions about observing people drunk before. Had you ever seen Justine Rathburn drunk before?
 {¶ 257} "A. Not before then, no.
 {¶ 258} "Q. Okay. Just out of curiosity, did she have a reputation around the school community for kind of faking being drunk at —
 {¶ 259} "Ms. Wells: Objection, Your Honor. *Page 26 
 {¶ 260} "The Court; Sustained.
 {¶ 261} "* * *
 {¶ 262} "Q. Was that the first time Justine had ever been to your apartment?
 {¶ 263} "A. Yeah, yeah.
 {¶ 264} "Q. But it wasn't the last, was it?
 {¶ 265} "A. No.
 {¶ 266} "Q. In fact, she's been over to your house at least on one occasion since then; right?
 {¶ 267} "Ms. Wells: Objection, Your Honor.
 {¶ 268} "The Court: What's the relevancy?
 {¶ 269} "Mr. Stansbury: Your Honor, I anticipate eliciting testimony from one of either the treatment professionals or Miss Rathburn herself, that she was so traumatized she didn't want to be anywhere near this site. And I believe that Mr. Avery can confirm that, in fact, she did go back to this site relatively soon after this alleged assault.
 {¶ 270} "The Court: Okay. At this time I'm going to sustain the objection. Move on to your next question."
 {¶ 271} April 9, 2007 Tr. at 161-162; 166.
 {¶ 272} Appellant asserts Justine Rathburn's reputation for faking being drunk at parties was admissible under Evidence Rule 404(B), as other acts evidence, demonstrating her mode of operation to lie about her level of intoxication.
 {¶ 273} We agree the trial court erred in not allowing Appellant to introduce evidence challenging Justine Rathburn's veracity by evidence of her past behavior in faking intoxication. However, upon review of the record, Appellant has not *Page 27 
demonstrated prejudice as a result of said error. There was ample, credible and competent evidence introduced at trial demonstrating Justine Rathburn's actual intoxication and impairment at the time of the incident in question.
 {¶ 274} Appellant further asserts the trial court erred in finding "kissing" is not a sexual activity. Specifically, Appellant cites the following exchange during the testimony of Raquel Sorg:
 {¶ 275} "Q. Okay. Well, you said earlier that there was some sort of contact.
 {¶ 276} "A. Yes.
 {¶ 277} "Q. Go ahead and describe that for me.
 {¶ 278} "A. Just — I mean, touching of the arms and kind of hugging each other when they were kissing, like —
 {¶ 279} "Q. Would you describe it as affectionate?
 {¶ 280} "A. Yes.
 {¶ 281} "Q. Okay.
 {¶ 282} "Ms. Welch: Your Honor, I guess at this point I'd like to state an objection.
 {¶ 283} "The Court: Well, I understand. But you're finished with this line of questioning, aren't you?
 {¶ 284} "Mr. Stansbury: I am, Your Honor.
 {¶ 285} "The Court: All right. Your objection will be noted. Let's proceed to the next question.
 {¶ 286} "Mr. Stansbury:
 {¶ 287} "Q. Okay. Now, I'm going to fast forward you to Chris Avery's — *Page 28 
 {¶ 288} "The Court: Now, before you do I want to make certain, as I indicated earlier, the Court cannot find that this was sexual activity."
 {¶ 289} April 9, 2007 Tr. at 248-249.
 {¶ 290} We find no error based upon the trial court's statement. We interpret the remark as merely noting kissing is insufficient to sustain a conviction for rape.
 {¶ 291} The third assignment of error is overruled.
 IV. {¶ 292} In the final assignment of error, Appellant argues his sentence of a one year commitment to DYS is unsupported by the record and contrary to law.
 {¶ 293} Juvenile courts have broad discretion to craft dispositions for delinquent children. In re D.S., 111 Ohio St.3d 361, 363,2006-Ohio-5851, 856 N.E.2d 921. Generally, courts of review will not disturb a trial court's choice of disposition absent an abuse of discretion. Id. When reviewing for an abuse of discretion, appellate courts must not substitute their judgment for that of the trial court.State ex rel. Duncan v. Chippewa Twp. Trustees (1995),73 Ohio St.3d 728, 732, 654 N.E.2d 1254; In re Jane Doe 1 (1991). 57 Ohio St.3d 135,137-138, 566 N.E.2d 1181.
 {¶ 294} Ohio law requires juvenile courts to make dispositions that are reasonably calculated to achieve the purposes set forth by statute for the disposition of juvenile delinquents. See R.C. 2152.01.FN3 Those purposes include, inter alia, the care and protection of children, the protection of the public interest, holding the delinquent accountable for his actions, restoring the victim and rehabilitating the offender. Despite the stated purposes of providing for the care, protection, and development of children, and to rehabilitate the offender, some circumstances justify substantial confinement in *Page 29 
order to fulfill the purposes of protecting public safety and holding the offender accountable. See In re J.B., Butler App. No. CA2004-09-226,2005-Ohio-7029, at paragraph 120. Therefore, if a sentence is within the appropriate statutory limit, reviewing courts presume that the trial court followed the applicable guidelines. State v. Wagner (1992),80 Ohio App.3d 88, 95-96, 608 N.E.2d 852.
 {¶ 295} Based upon our analysis and disposition of Appellant's first three assignments of error, we conclude the trial court did not abuse its discretion in committing Appellant to DYS for a period of one year.
 {¶ 296} For the reasons set forth above, Appellant's adjudication and commitment by the Licking County Court of Common Pleas, Juvenile Division, is affirmed.
 Hoffman, P.J., Gwin, J. and Wise, J. concur *Page 30 
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, Appellant's adjudication and commitment by the Licking County Court of Common Pleas, Juvenile Division, is affirmed. Costs assessed to Appellant. *Page 1