[Cite as *In re A.C.*, 2014-Ohio-640.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: A.C., DELINQUENT CHILD | : | **O P I N I O N** |
| | : | |
| | | **CASE NO. 2013-A-0024** |
| | : | |

Criminal Appeal from the Ashtabula County Court of Common Pleas, Juvenile Division, Case No. 12 JA 75.

Judgment: Affirmed.

*Thomas L. Sartini*, Ashtabula County Prosecutor and *Shelley M. Pratt,* Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047 (For Appellee-State of Ohio).

*Sheryl A. Trzaska*, Assistant State Public Defender, 250 East Broad Street, #1400, Columbus, OH 43215 (For Appellant-A.C.).

DIANE V. GRENDELL, J.

{¶1} Appellant, A.C., appeals from the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, adjudicating him delinquent of Rape and three counts of Gross Sexual Imposition, and ordering him to serve a minimum term of two-and-a-half years to a maximum term ending when he turns 21, in the Department of Youth Services. The issues to be determined by this court are whether delinquency adjudications for Rape and Gross Sexual Imposition are supported by the evidence when the victims' testimony is contradicted by the juvenile offender's testimony; whether *Miranda* is waived when a juvenile is informed of his rights prior to a short interview and

agrees to proceed; whether hearsay is admissible under the inconsistent statement exception when it is presented after the witness has finished her testimony; whether a disposition is proper when the juvenile court considered the necessary statutory factors; and whether the failure to raise these issues below constituted ineffective assistance of counsel. For the following reasons, we affirm the decision of the court below.

{¶2} On February 29, 2012, a Complaint was filed, alleging A.C. to be delinquent of one count of Rape, in violation of R.C. 2907.02(A)(1) and (b), a felony of the first degree if committed by an adult, and three counts of Gross Sexual Imposition, in violation of R.C. 2907.05(A)(4), felonies of the third degree if committed by an adult.

{¶3} On February 28 and March 8, 2013, an Adjudicatory Hearing was held before the juvenile court. The following evidence and testimony was presented.

{¶4} On July 3, 2011, eight-year-old T.V. and her sister, six-year-old Z.V., attended a party with their parents in Geneva Township, Ohio. During the party, T.V. and Z.V. went to a creek area with two other children, fifteen-year-old appellant, A.C., and his twelve-year-old sister, P.C. After spending a period of time playing at the creek, the children returned to the party. T.V. and Z.V. asked their mother for permission to return to the creek to swim, which was granted. The four children went to the creek for a second time, during which the alleged sexual assaults by A.C. occurred. The assaults included forced cunnilingus performed by A.C. on the six-year-old Z.V., as well as A.C. touching eight-year-old T.V. on both her chest and upper thigh, with T.V. telling A.C. that she did not want him to touch her.

{¶5} According to T.V. and Z.V.'s mother, Patricia Viruet, following the party, they made a short drive home. Soon after their arrival, and within 20 minutes of leaving

2

the party, both children told their mother that they were sexually abused by A.C. Viruet explained that during this conversation, Z.V. was "very embarrassed" and T.V. was "upset." Viruet called the police that night and was referred to the Child Advocacy Center.

{¶6} Janet Gorsuch, a Nurse Practitioner at the Child Advocacy Center, examined T.V. and Z.V. on July 21, 2011. She did not find physical evidence that was "significant" or specific to the alleged abuse by A.C.

{¶7} Videos of interviews with T.V. and Z.V. at the Child Advocacy Center were introduced at the hearing and played for the court. In T.V.'s interview, she stated that the second time the children went to the creek, she broke her toe on a rock. After this occurred, A.C. told her to sit down and relax. T.V. was alone with A.C. at this time. He asked her if he could touch her in her "wrong place," and she refused. He made promises to be her friend or give her money if she would let him touch her. After she continued to say "no," he "squeezed [her] boob" over her shirt and then rubbed her vaginal area. Following this incident, the four children walked back toward the party, with P.C. carrying T.V. on her back. During the return trip to the party, A.C. and Z.V. were walking ahead and T.V. could not see them for a period of time.

{¶8} T.V. testified at the hearing, explaining the events that occurred in a similar manner as in the interview. She testified that, after her refusal of A.C.'s advances, he touched her chest and her thigh "near" her vaginal area. Following this incident, while walking back to the party, A.C. and Z.V. were out of her view for approximately five minutes.

{¶9} In Z.V.'s interview at the Child Advocacy Center, she also explained that

on the second trip to the creek, T.V. broke her toe and was carried by P.C. During this time, Z.V. walked ahead, alone with A.C. At one point during this walk, he lay down on the ground, unzipped his pants, pulled Z.V. toward him, and put his penis on her stomach. She demonstrated with dolls how he pulled her on top of him. She stated that he also licked "inside [her] toto," or her vagina. He told her not to tell anyone or he would "be mad."

{¶10} At the hearing, Z.V. gave similar testimony, with some exceptions. She explained that while she was alone with A.C., he rubbed his "private part" on her belly while he was on the ground, but that she continued standing at that time. She stated that he pulled her underwear down and licked her "private area" while she was standing up. She explained that P.C. and T.V. caught up to them and she told P.C. what had happened.

{¶11} Detective Michael Rose testified regarding interviews he conducted with A.C. and P.C. on September 14, 2011. A video of these interviews was played, following defense counsel's objection to playing the portion including P.C.'s interview. A.C. denied being involved in any sexual activity with the girls and stated that "nothing happened." He stated that he was never alone with either of the girls.

{¶12} At the hearing, A.C. continued to deny having any sexual contact with T.V. and Z.V. He testified that on the trip back to the party after the second visit to the creek, he started to walk ahead of the three girls, around a bend in the path, because he had to urinate. While he was doing so, Z.V. came up beside him and he told her to go away. After she did not, he pushed her away. He testified that this was the only time he was alone with her. He explained that his statement to Detective Rose about never being

4

alone with the girls was inaccurate, since he was alone with Z.V. when she approached him, although he was never alone with T.V.

{¶13} In P.C.'s interview, she explained that T.V. and A.C. were behind her and Z.V. at one period in time while they were walking, but she turned around often and could see them. She stated that A.C. and Z.V. were ahead and out of view for two to five minutes during the walk back to the party, and she thought it was "weird" that they went off alone.

{¶14} At the hearing, P.C. testified that she carried T.V. back to the party after T.V. hurt her toe, while A.C. and Z.V. walked ahead. The two were out of her view for a period of two or three minutes. P.C. explained that Z.V. never told her about the sexual assault. She did not recall T.V. and A.C. being alone while they were at the creek, including after T.V. broke her toe.

{¶15} On March 8, 2013, the court issued a Judgment Entry, finding all counts against A.C. to be "true."

{¶16} A Dispositional Hearing was held on March 14, 2013. Defense counsel emphasized that A.C. had no criminal history. He submitted to the court letters from individuals on A.C.'s behalf. He argued that commitment to the Department of Youth Services (DYS) would not be beneficial to A.C. and he would be amenable to "local sanctions." The court held that it "does not have available to it any local program that will assist you. They just don't exist here." The court found that a DYS commitment would be the only place available to get A.C. any possible treatment and rehabilitation, and would protect the community. The court emphasized the seriousness of the crimes for which A.C. was found delinquent. On the same date, the trial court memorialized its

disposition in a Judgment Entry, ordering A.C. to be committed to DYS for a minimum term of one year, with a maximum commitment until A.C. turned 21 on the Rape charge, and a term of six months to the age of 21 on each of the three counts of Gross Sexual Imposition, with the terms to be served consecutively. He was also ordered to complete sexual offender treatment at DYS.

{¶17} A.C. filed a Motion for Stay of Sentence on April 12, 2013, which was denied.

{¶18} A.C. timely appeals and raises the following assignments of error:

{¶19} "[1.] [A.C.'s] adjudications were supported by insufficient evidence and against the manifest weight of the evidence * * *.

{¶20} "[2.] The juvenile court committed plain error when it admitted [A.C.'s] statement to law enforcement at trial, as [A.C.] did not knowingly, intelligently, or voluntarily waive his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). * * *

{¶21} "[3.] The juvenile court erred when it permitted [P.C.'s] statement to be played at trial and admitted into evidence. * * *

{¶22} "[4.] The juvenile court abused its discretion when it ordered [A.C.] committed to the Department of Youth Services. * * *

{¶23} "[5.] Trial counsel was ineffective for failing to file a motion to suppress [A.C.'s] uncounseled statement to law enforcement, failing to properly object to [P.C.'s] statement being admitted into evidence, and by failing to prepare an appropriate dispositional plan * * *."

{¶24} For ease of discussion, the assignments of error will be addressed out of

order.

{¶25} In his first assignment of error, A.C. argues that the adjudications were not supported by the evidence, emphasizing that the testimony and statements of T.V. and Z.V. were inconsistent and conflicting.

{¶26} In reviewing the sufficiency of the evidence to support juvenile adjudications of delinquency, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶27} "Weight of the evidence," in contrast to its sufficiency, involves "the inclination of the greater amount of credible evidence." (Citation omitted.) (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Whereas the "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." (Citation omitted). *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "In other words, a reviewing court asks whose evidence is more persuasive -- the state's or the defendant's?" *Id*. The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses, to determine whether, "in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." (Citation omitted.) *Thompkins* at 387.

{¶28} In order for A.C. to be adjudicated delinquent of Rape, the State was

7

required to prove, beyond a reasonable doubt, that he "engage[d] in sexual conduct with" a person who was "less than thirteen years of age." R.C. 2907.02(A)(1)(b). "Sexual conduct" includes, inter alia, "cunnilingus." R.C. 2907.01(A).

{¶29} In order for A.C. to be adjudicated delinquent of Gross Sexual Imposition, the State was required to prove, beyond a reasonable doubt, that he had "sexual contact with another [or]; cause[d] another * * * to have sexual contact with [him]" when the other "is less than thirteen years of age." R.C. 2907.05(A)(4). Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶30} The State presented sufficient evidence on each of the foregoing charges against A.C. There was no question that both T.V. and Z.V. were under the age of thirteen on the date of the offenses. Regarding the Rape adjudication, Z.V. testified that A.C. pulled down her underwear and licked "inside" of her private area and that it felt "a little weird." She made similar allegations in her interview just a few weeks after the incident. This is sufficient to establish cunnilingus, which constitutes sexual conduct.

{¶31} Regarding the Gross Sexual Imposition adjudications, Z.V. testified that A.C. placed his penis on her stomach, causing her to touch his genitals, a form of sexual contact under the statute. T.V. testified that A.C. touched both her breast and her thigh area near her pubic region. As to the sexual arousal or gratification element, T.V. explained that A.C. touched her after repeatedly making requests to do so. Moreover, "[i]t is sufficient to present circumstantial evidence from which the finder of fact can infer the purpose of the act was for sexual gratification; no direct evidence of

8

the accused's mental state is required." (Citations omitted.) *State v. Hake*, 11th Dist. Trumbull No. 2007-T-0091, 2008-Ohio-1332, ¶ 26. "A sexual purpose can be inferred from the nature of the act itself if a reasonable person would find that act sexually stimulating to either the offender or the victim." (Citation omitted.) *State v. Tennyson*, 11th Dist. Lake No. 98-L-219, 2001 Ohio App. LEXIS 5211, 8 (Nov. 21, 2001). A.C. purposely touched both girls multiple times in a manner that would be seen by a reasonable person as sexually stimulating to A.C.

{¶32} The adjudications were also supported by the manifest weight of the evidence. As discussed above, both T.V. and Z.V. gave testimony and statements that were consistent and established the same physical conduct by A.C. P.C. and T.V. corroborated the fact that A.C. was alone with Z.V. for a period of time. There was also testimony to establish that P.C. and Z.V. did not see every action taken by T.V. and A.C., who were walking behind them.

{¶33} A.C. questions the testimony regarding the timeline of the events that occurred surrounding the sexual assaults. He asserts that P.C. and Z.V.'s testimony established that he was not alone with T.V. after she hurt her toe and, therefore, T.V.'s version of events must be untrue. We recognize that there were some inconsistencies, but these were made clear to the juvenile court, which was able to fully evaluate the weight to give the testimony presented. The fact that the timeline of the events may have been wrong or inconsistent does not immediately discredit T.V.'s testimony. Nurse Practitioner Gorsuch testified that, in her extensive experience working with children in her capacity at the Advocacy Center, children often recount incidents out of sequence when describing sexual abuse. P.C. stated that A.C. and T.V. were behind

her for some period of time and it was not clear whether P.C. and Z.V. were with T.V. and A.C. continually. The incident described by T.V. lasted for a very short period of time and could have happened while P.C. or Z.V. were not looking.

{¶34} T.V. testified that A.C. touched her breast over her shirt and the area near her vagina. She reported this to her mother on the same day as the incident occurred, was upset while she was discussing it, and gave a detailed description of the events surrounding the conduct, including the specific requests made by A.C. to touch her. Although A.C. denied these claims, the credibility of the witnesses' testimony is an issue for the finder of fact. *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986) (when examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact").

{¶35} A.C. also takes issue with the lack of consistency as to Z.V.'s testimony. Both Z.V.'s testimony and interview included her explanation of the same critical facts, that A.C. was alone with her, put his penis on her stomach and licked inside of her vagina. Both P.C. and T.V. testified that A.C. was alone with Z.V. for a period of at least a few minutes and was not in their view. Z.V. told her mother of the incident on the same date and was emotional when she did so. Each of these facts bolstered her testimony and provided a basis for the trial court to find her credible.

{¶36} A.C. asserts that Z.V.'s version of the events was physically "impossible," since Z.V. said that she was standing up while A.C. was lying down and touching her with his penis. While Z.V. may have stated during her testimony that she was standing while A.C. was lying down, she did reenact the incident with dolls in her interview soon

10

after the incident happened and was fresh in her mind. She showed that A.C. pulled her down toward him until she was almost lying on top of him. Nothing about this description of the events was impossible.

{¶37} The fact that there were other conflicts in the testimony, such as Z.V.'s assertion that she screamed, with no corroboration from P.C. or T.V. as to that specific issue, does not render Z.V.'s testimony regarding the entire incident untruthful. P.C.'s denial that Z.V. told her about the abuse is an issue of credibility best determined by the finder of fact. It was not unreasonable for the court to believe that P.C. may want to protect her brother or that Z.V. was generally a more credible witness. The court was entitled to determine that P.C. was being untruthful. *State v. Thomas*, 11th Dist. Lake No. 2004-L-176, 2005-Ohio-6570, ¶ 29 (the trier of fact was "free to believe all, some, or none of the testimony of each witness appearing before it"). Provided that the lower court reached this conclusion, there is no basis for determining that P.C.'s testimony would outweigh Z.V.'s statement and testimony.

{¶38} We emphasize that the "granting of a new trial is exercised only in exceptional cases where the evidence *weighs heavily against a conviction*." (Emphasis added.) *State v. Wynder*, 11th Dist. Ashtabula No. 2001-A-0063, 2003-Ohio-5978, ¶ 23. We cannot say that this is true in the present matter, especially given that much of the testimony required determinations of credibility made by the trier of fact.

{¶39} The first assignment of error is without merit.

{¶40} In his third assignment of error, A.C. asserts that the interview of P.C., conducted by Detective Rose, should not have been played at trial after she was excused as a witness, since it was inadmissible hearsay.

11

**{¶41}** The State argues that P.C.'s interview was admissible as a prior inconsistent statement that was used to impeach her testimony given at trial.

**{¶42}** "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991). Likewise, "[t]he trial court has broad discretion to determine whether a declaration should be admissible as a hearsay exception." *State v. Dever*, 64 Ohio St.3d 401, 410, 596 N.E.2d 436 (1992).

**{¶43}** Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is inadmissible at trial, unless it falls under an exception to the Rules of Evidence. Evid.R. 802.

**{¶44}** Pursuant to Evid.R. 613(B), a party may introduce extrinsic evidence of a witness' prior inconsistent statement to impeach his or her credibility. The rule states, in pertinent part:

**{¶45}** "Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:

**{¶46}** "(1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;

**{¶47}** "(2) The subject matter of the statement is one of the following:

**{¶48}** "(a) A fact that is of consequence to the determination of the action other

12

than the credibility of a witness[.]"

**{¶49}** *Id.*; *State v. Simpson*, 11th Dist. Lake No. 93-L-014, 1994 Ohio App. LEXIS 4472, 47 (Sept. 30, 1994) ("[w]hen extrinsic evidence of a prior inconsistent statement is offered into evidence pursuant to Evid.R. 613(B), a foundation must be established through direct or cross-examination in which: (1) the witness is presented with the former statement; (2) the witness is asked whether he made the statement; (3) the witness is given an opportunity to admit, deny or explain the statement; and (4) the opposing party is given an opportunity to interrogate the witness on the inconsistent statement") (citation omitted).

**{¶50}** Pursuant to Evid.R. 607(A), "[t]he credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."

**{¶51}** A.C. argues that the State did not lay a foundation for P.C.'s interview to be included as a prior inconsistent statement. While P.C. was testifying, the State asked her if she spoke to police, to which she stated that she did not remember. "[I]f the witness says he cannot remember the prior statement, 'a lack of recollection is treated the same as a denial, and use of extrinsic impeachment evidence is then permitted.'" (Citation omitted.) *State v. Lemons*, 11th Dist. Trumbull No. 2009-T-0032, 2010-Ohio- 3807, ¶ 39. P.C. was then asked what she thought about A.C. and Z.V. being alone, to which she responded that she did not think anything of it, which was different than the statement given during her interview, that it was "weird." She also testified that T.V. and A.C. were never alone and did not explain that they were walking

13

behind her, as she did in her interview.

{¶52} In addition, A.C. was given an opportunity to cross-examine her as to these issues brought out in the State's direct examination. The court, in denying the objection to the admission of the videotaped interview during Detective Rose's testimony, also told defense counsel that P.C. could be recalled in order to address issues that arose after playing the interview. Based on the foregoing, all of the required steps were taken to admit the inconsistent statement, since P.C. was asked about the statement, did not recall making any statements, and defense counsel had the opportunity to cross-examine her.

{¶53} The State was also able to show that there was surprise and affirmative damage to justify attacking P.C.'s credibility. P.C. had given an interview in which she stated that it was "weird" that her brother and Z.V. were alone and changed this statement during her testimony. Where there is no evidence to show that the State was aware that the witness would testify in a different manner than her prior statements, the element of surprise is established. *State v. Armstrong*, 11th Dist. Trumbull Nos. 2001-T-0120 and 2002-T-0071, 2004-Ohio-5635, ¶ 102; *State v. Bauer*, 8th Dist. Cuyahoga No. 44637, 1982 Ohio App. LEXIS 11961, 7 (Dec. 16, 1982) ("[i]t was certainly reasonable for the prosecutor to expect [the witness] to testify consistently with his taped statement").

{¶54} Further, this caused affirmative damage to the State's case, in that P.C.'s original statements provided some support to the idea that A.C. may have been doing something improper with Z.V. and T.V. "Affirmative damage can be shown if the party's own witness' testimony contradicts, denies, or is harmful to that party's trial position."

14

(Citation omitted.)  *Armstrong* at ¶ 103.

{¶55}  While A.C. argues that it was improper to allow the video of the interview to be played after P.C. left the witness stand, i.e., during Detective Rose's testimony, there does not appear to be a requirement that the evidence be presented during the witness' testimony.  *See State v. Reed*, 155 Ohio App.3d 435, 2003-Ohio-6536, 801 N.E.2d 862, ¶ 30 (2nd Dist.) (the witness' lack of memory laid a foundation for the admission of the testimony of a detective regarding her prior statements).  P.C. was given a chance to respond to the issue when it was raised during her testimony and defense counsel was also informed that it could recall her as a witness if necessary.

{¶56}  A.C. also argues that it was a violation of the Confrontation Clause and *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.E.2d 177 (2004), to allow the interview to be played, since A.C. was unable to confront the witness against him, P.C.

{¶57}  The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."  In *Crawford*, the United States Supreme Court held that the admission of a hearsay statement violated the Sixth Amendment right to confront witnesses where the statement was testimonial in nature and the defendant had no opportunity to cross-examine the declarant.  *Crawford* at 68.

{¶58}  As discussed above, A.C. was not deprived of the right to cross-examine P.C.  His counsel was able to do so while she was testifying and after the State had questioned her about the interview given to the police.  Further, the court told counsel that he could recall P.C. after the taped interview was played, which counsel did not do.

15

Since A.C. had the opportunity to cross-examine P.C., we cannot find that a violation of the Confrontation Clause occurred. *State v. Skerness*, 5th Dist. Coshocton No. 09-CA-28, 2011-Ohio-188, ¶ 69 (where the statement of the declarant was admissible as a prior inconsistent statement and the declarant testified at trial and was subject to cross-examination, the Confrontation Clause was not violated).

**{¶59}** Although the whole interview with P.C. was played, which lasted only a few minutes, we presume that the trial court "considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *State v. White*, 15 Ohio St.2d 146, 151, 239 N.E.2d 65 (1968). It does not appear that the juvenile court relied on any statements of P.C. not related to those that showed her inconsistency.

**{¶60}** The third assignment of error is without merit.

**{¶61}** In his fourth assignment of error, A.C. argues that the juvenile court abused its discretion in issuing its disposition, by failing to place him in a treatment program rather than the Department of Youth Services.

**{¶62}** The State argues that the court properly considered the seriousness of the charges, the community's need to be protected, and the necessity of getting proper treatment for A.C., which were appropriate justifications for the disposition.

**{¶63}** A juvenile court's disposition for a child adjudicated delinquent "will be upheld unless there has been an abuse of discretion." *In re D.S.*, 111 Ohio St.3d 361, 2006-Ohio-5851, 856 N.E.2d 921, ¶ 6; *In re Fox*, 11th Dist. Portage No. 2000-P-0008, 2001 Ohio App. LEXIS 2584, 9 (June 8, 2001) ("[u]pon review of a juvenile court proceeding, a trial court's imposition of sentence will not be disturbed absent an abuse

of discretion"). An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Haney*, 11th Dist. Lake No. 2012-L-098, 2013-Ohio-2823, ¶ 56, citing *State v. Beechler*, 2nd Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.2004). The juvenile court holds this discretion because it has the "opportunity to see and hear the delinquent child, to assess the consequences of the child's delinquent behavior, and to evaluate all the circumstances involved." *In re Caldwell*, 76 Ohio St.3d 156, 160-161, 666 N.E.2d 1367 (1996).

**{¶64}** In reaching a disposition, a juvenile court should consider the purposes for such dispositions, which are "to provide for the care, protection, and mental and physical development of children * * *, protect the public interest and safety, hold the offender accountable for the offender's actions, restore the victim, and rehabilitate the offender." R.C. 2152.01(A). Dispositions "shall be reasonably calculated to achieve the overriding purposes set forth in this section, commensurate with and not demeaning to the seriousness of the delinquent child's * * * conduct and its impact on the victim, and consistent with dispositions for similar acts committed by similar delinquent children." R.C. 2152.01(B).

**{¶65}** During the dispositional hearing, the State recommended commitment of A.C. to the Department of Youth Services, since this was in the best interest of the victims and the offenses were "extreme." The juvenile court emphasized the seriousness of the crimes and the need to ensure the safety of individuals in the community. The court explained that the Department of Youth Services would provide proper treatment and rehabilitation. The court ordered that A.C. complete sex offender

17

treatment available at DYS. Based on these statements, the court considered the necessary factors, including the seriousness of the crime, the impact to the victims, and the need for A.C. to be held accountable while also receiving treatment.

{¶66} A.C. argues that the court did not consider other programs, in which he could have received treatment and remained closer to home. However, the court's statements appear to indicate that the commitment to DYS would be able to best provide both the treatment necessary while balancing the other considerations, such as protecting the victims and the community. The juvenile court is in the best position to make a determination regarding the treatment options available. Further, we note that the record does not show A.C. presented any additional options to the lower court that were arbitrarily rejected or that would provide some support for his current argument that other programs would have been available to him. We have no basis to second guess the lower court's conclusion that there were no more appropriate alternatives available for the disposition at the time of the hearing. *In re Jane Doe 1*, 57 Ohio St.3d 135, 137-138, 566 N.E.2d 1181 (1990) (when applying the abuse of discretion standard, an appellate may not substitute its judgment for that of the trial court).

{¶67} A.C. focuses primarily on the impact of the disposition to him. While it is important for a juvenile court to provide for the care and protection of children, "some circumstances justify substantial confinement in order to fulfill the purposes of protecting public safety and holding the offender accountable." *In re Jorgensen*, 5th Dist. Licking No. 07-CA-96, 2008-Ohio-2967, ¶ 294. Here, the sentence was appropriate both because it protected the public and still allowed for A.C. to receive treatment. Any argument that this was not the least restrictive alternative must be rejected, since R.C.

18

2152.01(A) contains no such requirement, but mandates that the court consider the factors discussed above. *See In re Antwon C.*, 182 Ohio App.3d 237, 2009-Ohio-2567, 912 N.E.2d 182, ¶ 9 (1st Dist.) (rejecting the argument that the trial court was required to consider the least restrictive alternative in reaching its disposition).

{¶68} A.C. also argues that removing him "from his home over two years after this incident occurred was disproportionate to the offenses, and harmful." However, he provides no support for the apparent proposition that the two-year delay was a relevant consideration for the trial court in reaching its disposition. The existence of a two-year period of time between the date of the offense and the date of the disposition does not warrant a lesser penalty, especially given the considerations discussed above.

{¶69} Finally, the disposition in this case was consistent with the statutory requirements. Pursuant to R.C. 2152.16, the juvenile court was permitted to commit A.C. for a term of "one to three years * * * and a maximum period not to exceed the child's attainment of twenty-one years of age" for the Rape, and a "minimum period of six months and a maximum period not to exceed the child's attainment of twenty-one years of age" for the charges of Gross Sexual Imposition. R.C. 2152.16(A)(1)(c) and (e). Based on the foregoing, we cannot find that the trial court's disposition was an abuse of discretion.

{¶70} The fourth assignment of error is without merit.

{¶71} In his second assignment of error, A.C. argues that the juvenile court committed plain error when it admitted his statement given to Detective Rose, since he did not waive his rights under *Miranda*.

{¶72} Generally, the failure to object to the admission of a defendant's

19

confession is considered under an ineffective assistance of counsel framework, since the issue of whether a statement should be excluded is presented to the court through a suppression motion prior to the trial. Although A.C. argues that defense counsel should have objected, he is essentially asserting that his statements should have been suppressed. A.C. raises this issue under his fifth assignment of error as well, related to ineffective assistance of counsel. We will first address whether counsel was ineffective by his failure to request suppression of A.C.'s statements.

**{¶73}** The Ohio Supreme Court has adopted a two-part test to decide whether an attorney's performance is below the constitutional standard for effective assistance of counsel. To reverse a conviction due to ineffective assistance of counsel, the defendant must prove "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." *State v. Madrigal*, 87 Ohio St.3d 378, 388-389, 721 N.E.2d 52 (2000), citing *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's performance was reasonable considering all the circumstances." *Strickland* at 688. "There is a strong presumption that the attorney's performance was reasonable." *State v. Gotel*, 11th Dist. Lake No. 2006-L-015, 2007-Ohio-888, ¶ 10.

**{¶74}** "To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65.

**{¶75}** Initially, the State argues that the video of A.C.'s interview with Detective

Rose was admissible because he was not in custody at the time of the interview. "Statements obtained during the custodial interrogation of a defendant are not admissible at trial unless the police have used procedural safeguards to secure the defendant's Fifth Amendment right against self-incrimination and Sixth Amendment right to representation." (Citation omitted.) *In re J.C.*, 11th Dist. Geauga No. 2011-G-3017, 2011-Ohio-5864, ¶ 74. "Only *custodial* interrogation triggers the need for *Miranda* warnings." (Emphasis sic.) *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 47.

{¶76} In determining whether an individual is in custody for the purposes of *Miranda*, the court must consider "the circumstances surrounding the interrogation" and whether, under those circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). In order for custodial interrogation to occur, there must be "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." (Citation omitted.) *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983).

{¶77} In the present case, we recognize that there are factors weighing both for and against a finding that the interrogation was custodial. A.C. was told that he could leave at any time, but he was in a police interview room, at the station where he had been taken by his mother. He had been informed of his *Miranda* rights while in the room. There is at least some question as to whether a reasonable person would have believed he was in custody. Regardless of this however, the evidence shows that A.C.'s statements during the interview were not involuntary or given in violation of

21

*Miranda*.

{¶78} The court looks to the totality of the circumstances test "[t]o determine whether a suspect knowingly, intelligently, and voluntarily waived his Miranda rights." *State v. Petruccelli*, 11th Dist. Lake No. 2010-L-054, 2011-Ohio-3292, ¶ 40. The factors to be considered under this test include "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *In re Watson*, 47 Ohio St.3d 86, 90, 548 N.E.2d 210 (1989).

{¶79} Detective Rose stated each of the *Miranda* rights to A.C. He then asked if A.C. understood these rights, to which A.C. responded "yeah." Detective Rose asked A.C. to state the rights back to him, to which A.C. responded that he "can have an attorney * * * I don't know the whole - -" and was interrupted by Detective Rose. Detective Rose then further explained that "you don't have to talk to me" and that A.C. could get up and leave. He then asked if A.C. was willing to talk to him, and explained that he was a suspect, could incriminate himself and could "make [himself] guilty." A.C. responded "yeah." A.C. did not ask to cease questioning or request an attorney at any time.

{¶80} Although A.C. was not able to list back all of the rights, he never stated that he did not understand them. He responded affirmatively several times when asked if he understood and if he wished to continue the interview. Detective Rose described the rights as required by *Miranda* and made a second effort to restate A.C.'s rights with additional explanation.

{¶81} Regarding the totality of the circumstances, A.C. had no criminal

22

experience and was 16 years old at the time of the interview. There is nothing in the record to indicate that he had any mental deficiencies. The interview of A.C. was relatively short, lasting a total of approximately 45 minutes. A.C. was interviewed for around 22 minutes, took a ten minute break while his sister spoke with Detective Rose, and was then interviewed for an additional 23 minutes. No threats or inducements were made to A.C. to cause him to continue with the interview or make a confession. The interview was not intense and, in fact, A.C. never admitted to any of the allegations. Based on the totality of the circumstances, we find that A.C.'s statements were not given in violation of *Miranda*.

{¶82} Moreover, "[a]n express written or oral statement of waiver * * * is not inevitably either necessary or sufficient to establish waiver." *State v. Freeman*, 11th Dist. Trumbull No. 2001-T-0008, 2002 Ohio App. LEXIS 1205, 12 (Mar. 15, 2002), citing *State v. Scott*, 61 Ohio St.2d 155, 400 N.E.2d 375 (1980), paragraph one of the syllabus. Since the facts establish that A.C. waived his right to *Miranda* through his answers to Detective Rose's questions and his cooperation during the interview, the lack of an express waiver does not render the statements involuntary or inadmissible.

{¶83} Since there is no basis to find that counsel was ineffective for failing to file a motion to suppress the interview of A.C, it follows that it was not plain error to admit the interview at trial.

{¶84} In his fifth assignment of error, A.C. also argues that counsel was ineffective by failing to present an alternative placement for A.C. in order to prevent him from being placed in DYS. However, as discussed above, the court's placement of A.C. in DYS was based on several factors, including the existence of an appropriate

23

treatment plan, as well as the need to protect the community and the victims. There is no evidence that defense counsel's presentment of an alternative plan would have been accepted by the trial court, given its explanation for its sentence and the State's recommendation that A.C. be committed to DYS.

{¶85} Finally, A.C. argues that defense counsel was ineffective by failing to "properly object" to the admission of P.C.'s videotaped interview, in that it did not raise the correct type of objection, including an objection under the Confrontation Clause. Since we conclude that it was not error to admit this interview, for the reasons discussed above, counsel's failure to "properly object" was not ineffective assistance of counsel.

{¶86} The second and fifth assignments of error are without merit.

{¶87} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, adjudicating A.C. delinquent of Rape and three counts of Gross Sexual Imposition and ordering him to serve a minimum term of two-and-a-half years to a maximum term until the age of 21 in DYS, is affirmed. Costs to be taxed against the appellant.


TIMOTHY P. CANNON, P.J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.


_____


COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

24

{¶88} Finding merit in the assertion the judgment in this case is against the manifest weight of the evidence, I would reverse and remand on the basis of the first assignment of error. I would also reverse and remand on the basis of the third assignment of error.

{¶89} I recognize that discrepancies may arise in a witness' account of events between the time of an investigatory interview, and trial. But I find the discrepancies in the testimony of T.V. and Z.V. too significant to overlook. A.C. argues the testimony of both P.C., and Z.V. establishes he was never alone with T.V. after she broke her toe, and that P.C. was with T.V. throughout the period after she broke her toe. This seems true. The majority cites to P.C.'s testimony that A.C. and T.V. were walking behind her, and out of her sight, for some period to bolster the idea A.C. had a chance to assault T.V. But this could not have occurred except when the children were walking from the party to the creek, since P.C. carried the injured T.V. back to the party. And yet, according to T.V., A.C. assaulted her after she broke her toe, at the creek.

{¶90} Z.V. insisted at the hearing that A.C.'s assaults upon her – i.e., performing oral sex, and rubbing his penis against her stomach – occurred while he was lying on the ground, and she was standing up. This does not seem physically possible. Z.V. insisted she screamed when A.C. did these things to her – but neither P.C. nor T.V. heard any scream.

{¶91} Since Nurse Practitioner Gorsuch could not testify regarding any significant or specific physical evidence corroborating the alleged abuse, A.C.'s fate depended solely on the testimony of T.V. and Z.V., but the timeline relating to their testimony does not work, and events are described which do not seem possible.

**{¶92}** I also find merit in the third assignment of error, whereby A.C. objects to the playing of Detective Rose's interview with his sister, P.C., after she left the stand and had concluded her testimony. The state justified this as being for impeachment purposes, pursuant to Evid.R. 613(B). I agree with A.C. that the record indicates this was done to prove the truth of the matter asserted. Only two slight discrepancies between P.C.'s police interview, and her trial testimony, are cited by the majority in upholding the trial court's decision to let the recorded statement into evidence. One is she stated in the interview that her brother and T.V. were walking behind her at one point, whereas she testified those two children were never alone. The second is her interview statement that she thought it "weird" when her brother and Z.V. were alone, compared to her testimony that she did not think anything about this. I am dubious whether these inconsistencies are sufficient to establish the surprise and affirmative damage necessary to make them admissible.

**{¶93}** Further, the recording was played during Detective Rose's testimony, after P.C. had left the stand. *If* the purpose of playing the recording was to impeach P.C.'s testimony, then, as A.C. argues on appeal, the specific inconsistent statements from the interview should have been presented to P.C. while she was on the stand, and she should have been asked to explain them at that time. The playing of her entire interview went beyond the purpose for which the statement was offered, i.e., impeachment. I respectfully disagree that giving defense counsel permission to recall this little girl, following the playing of the recorded statement, cured this deficiency. It was the state's job to impeach her testimony, if it could, not that of defense counsel.

**{¶94}** I respectfully dissent.